**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                    Case No. 3:09-cv-814-J-34JRK

$1,761.00 IN U.S. CURRENCY,
$8,047.00 IN U.S. CURRENCY,
and a 2004 MERCEDES CLK 320,
VIN WDBTJ65JX4F094579,

        Defendants.

_____/

## REPORT AND RECOMMENDATION[1]

This cause is before the Court on Plaintiff's Motion for Summary Judgment (Doc. No. 23; "Motion"), filed February 2, 2011.  In the Motion, Plaintiff seeks forfeiture of $1,761 in U.S. currency; $8,047 in U.S. currency; and a 2004 Mercedes CLK 320, VIN WDBTJ65JX4F094579 (collectively "Subject Property") pursuant to 21 U.S.C. § 881(a)(4) and (6) ("Section 881") of the Controlled Substances Act, 21 U.S.C. § 801 et seq.  Motion at 1, 3.  The Motion was referred to the undersigned by the Honorable Marcia Morales Howard, United States District Judge, on March 28, 2011 for the issuance of a Report and Recommendation regarding an appropriate resolution.  See Order of Referral (Doc. No. 28).

### I.  Background

On July 29, 2009, Plaintiff filed a Verified Complaint for Forfeiture In Rem (Doc. No. 1; "Complaint") seeking forfeiture of the Subject Property pursuant to Section 881.  Compl.

---

[1] Specific, written objections may be filed in accordance with 28 U.S.C. § 636 and Rule 6.02, Local Rules, United States District Court, Middle District of Florida ("Local Rule(s)"), within fourteen (14) days after service of this document.  Failure to file a timely objection waives a party's right to a de novo review.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Local Rule 6.02(a).

at 1-2 ¶ 1.  In the Complaint, Plaintiff alleges the $1,761 and the $8,047 are subject to forfeiture "because [the money] constitutes proceeds traceable to the exchange of controlled substances or was intended to be exchanged for controlled substances . . . ."  Id. at 3 ¶ 6.  With regard to the 2004 Mercedes CLK 320, Plaintiff asserts the vehicle is subject to forfeiture "because the . . . vehicle was used, or intended to be used, to transport, or in any manner, facilitate the transportation, sale, receipt, possession, or concealment of controlled substances . . . ."  Id.

On September 10, 2009, Leonard Leroy White ("Mr. White") filed a Verified Claim (Doc. No. 10) as to the Subject Property.  In the Verified Claim, Mr. White asserts that the currency was obtained from a legitimate source and that the vehicle was purchased with legitimate money.  See Verified Claim at 1 ¶ 2.  Thereafter, on September 28, 2009, Mr. White filed an Answer (Doc. No. 11) to the Complaint.  In the Answer, Mr. White raises two affirmative defenses: (1) the 2004 Mercedes CLK 320 "was not used in the commission of, or violation of, the narcotics laws and should not be subject to forfeiture"; and (2) the $1,761 and the $8,047 "were not obtained from or used in the commission of, or violation of, the narcotics laws and were otherwise monies received as a result of compensation for damages in an automobile accident."  Answer at 1.

Thereafter, on February 2, 2011, the instant Motion was filed.  On February 3, 2011, after the Motion was filed, the Clerk of Court issued a Summary Judgment Notice (Doc. No. 24; "Notice"), which set forth some "explanatory admonitions . . . for the benefit of pro se parties . . . who oppose the summary judgment motion[]."  Notice at 1 (emphasis omitted).  Additionally, the Notice advised that a decision to grant the Motion would be a final decision of the Court and would preclude the matter from being litigated later.  Id. at 1-2.  Further, the

Notice advised the following: "(1) failing to respond to th[is] motion[] will indicate that the motion[] [is] not opposed; (2) all material facts asserted by the movant in the motion[] will be considered to be admitted by you unless controverted by proper evidentiary materials . . . filed by you; and (3) you may not rely solely on the allegations of the issue pleadings . . . in opposing th[is] motion[]." Id. at 2 (citation omitted).

On February 23, 2011, Mr. White filed a Motion for Appointment of Counsel (Doc. No. 25), which was denied on March 2, 2011, see Order (Doc. No. 27; "March 2, 2011 Order"). In the Motion for Appointment of Counsel, Mr. White included the following brief statements in opposition to the instant Motion: "The material facts asserted by movant in the [M]otion are negated by . . . [Mr. White].  [He] is in possession of facts and proper evidentiary material refuting the movant's claim."  Motion for Appointment of Counsel at 3.  In the March 2, 2011 Order, Mr. White was advised that his brief reference to the Motion was insufficient, and he was directed as follows:

> Mr. White shall file a more complete response to the Motion for Summary Judgment, including a memorandum of legal authority in compliance with Local Rule 3.01(b).  The failure to file a response in compliance with Local Rule 3.01(b) will result in the Motion for Summary Judgment being deemed unopposed by Mr. White.

March 2, 2011 Order at 3.  Mr. White was given until March 21, 2011 to file a more complete response to the Motion.  See id. at 4.  To date, Mr. White has failed to do so.

Notwithstanding Mr. White's failure to sufficiently respond to the Motion, the Court must consider the merits of the Motion.  See United States v. One Piece of Real Property, 363 F.3d 1099, 1101 (11th Cir. 2004) (stating that "the district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed but, rather, must consider the merits of the motion") (citation omitted).  Although the Court must consider the

merits of the Motion, "[t]here is no burden upon the . . . [C]ourt to distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (citation omitted).

Having considered the Motion, the evidence submitted, and the entire record, the undersigned recommends that the Motion be granted.

## II.  Legal Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2011). "The burden of demonstrating the satisfaction of this standard lies with the movant," Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003), who must present "depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials" to show that the facts cannot be genuinely disputed. Fed. R. Civ. P. 56(c)(1)(A). An issue is genuine when a reasonable jury could return a verdict for the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). In ruling on a motion for summary judgment, a court must "constru[e] the facts and draw[] all reasonable inferences therefrom in the light most favorable to the non-moving party." Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005) (citing Cuesta v. Sch. Bd. of Miami-Dade Cnty., 285 F.3d 962, 966 (11th Cir. 2002)).

Section 881(a) of the Controlled Substances Act provides for the forfeiture of certain property that is connected to illegal drug transactions. The general rules for civil forfeiture proceedings are set forth in 18 U.S.C. § 983 ("Section 983"). In a Section 881 civil forfeiture action, upon motion for summary judgment by the Government, "the burden of proof is on

the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture[.]" 18 U.S.C. § 983(c)(1). "[I]f the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3). "[T]he Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture[.]" 18 U.S.C. § 983(c)(2). Additionally, the Government may rely on circumstantial evidence, and the court should evaluate the evidence presented with "'a common sense view to the realities of normal life.'" United States v. $291,828.00 in U.S. Currency, 536 F.3d 1234, 1237 (11th Cir. 2008) (quoting United States v. Four Parcels of Real Property in Green & Tuscaloosa Cntys. in the State of Ala., 941 F.2d 1428, 1440 (11th Cir. 1991)). The Government does not have to produce evidence connecting the property to be seized "to a particular narcotics transaction"; rather, it need only show the property was "'related to some illegal drug transaction.'" United States v. $183,791.00 in U.S. Currency, 391 F. App'x 791, 794 (11th Cir. Aug. 9, 2010) (unpublished) (quoting United States v. $242,484.00 in U.S. Currency, 389 F.3d 1149, 1160 (11th Cir. 2004)).

If the Government meets its burden of establishing that the property is subject to forfeiture, the burden then shifts to the claimant to the property "to show, by a preponderance of the evidence, that the property is not subject to forfeiture." United States v. Cleckler, 270 F.3d 1331, 1334 (11th Cir. 2001). As an initial matter, the claimant must establish that he or she has standing to contest a civil forfeiture action. United States v. $114,031.00 in U.S. Currency, 284 F. App'x 754, 755 (11th Cir. July 7, 2008) (unpublished).

If the claimant has standing, he or she can meet the burden "either by rebutting the [G]overnment's evidence or by showing that the claimant is an innocent owner." Cleckler, 270 F.3d at 1334; see 18 U.S.C. § 983(d).[2]

### III.  Facts

These facts are taken in the light most favorable to Mr. White, the non-moving party. The relevant chronology of events began at some point prior to 2008, at which time Mr. White started selling drugs to a man named "Shorty."  See Deposition of Leonard L. White (Doc. No. 23-1; "White Dep.")[3] at 21, 26-27, 30-31.  The two men developed a relationship centering on illegal drug transactions.  See id.  During this relationship, Shorty sometimes would call Mr. White and request "the usual" or "a deuce," indicating to Mr. White that he

---

[2]      In Cleckler, the United States Court of Appeals for the Eleventh Circuit discussed the effect of the then-recently passed Civil Asset Forfeiture Reform Act of 2000 ("CAFRA").  The Court recognized that CAFRA changed certain civil forfeiture action procedures and applies to forfeiture cases "commenced on or after 120 days from the enactment date of 25 April 2000."  Cleckler, 270 F.3d at 1334 n.2.  Because of the circumstances in Cleckler, the Court applied pre-CAFRA law.  See id. at 1333-34.  In part, CAFRA raised the Government's burden from "probable cause" to "preponderance of the evidence."  See 18 U.S.C. § 983(c).  Also, the "innocent owner" defense that had been deleted from the prior version of 21 U.S.C. § 881(a)(7) was codified at 18 U.S.C. § 983(d).  Although CAFRA provides a defense to forfeiture, it does not contain any language regarding the burden shifting to a claimant to rebut the Government's evidence once the Government has met its burden.  Nevertheless, in cases decided after Cleckler governed by CAFRA, district courts have continued to cite Cleckler for the proposition that after the Government meets its burden, the burden shifts to the claimant to establish by a preponderance of the evidence that the property is not subject to forfeiture by either rebutting the Government's evidence or by showing that the claimant is an innocent owner.  See, e.g., United States v. $17,466.00 in U.S. Currency, No. 2:09-cv-887-MEF, 2010 WL 4923353, at *4 (M.D. Ala. Nov. 29, 2010) (unpublished); United States v. $14,066.00 in U.S. Funds, No. 5:09-cv-195 (HL), 2010 WL 4823375, at *3 (M.D. Ga. Nov. 22, 2010) (unpublished); United States v. $6,207 in U.S. Currency, 757 F. Supp. 2d 1155 (M.D. Ala. 2010); United States v. One Parcel of Property, No. 2:07-cv-694-MEF, 2010 WL 1346367, at *3 (M.D. Ala. Apr. 5, 2010) (unpublished); United States v. 2001 Chevrolet Suburban SUV, VIN 3GNEC16T81G117995, FL TAG CY26B, No. 3:07-cv-353-J-32TEM, 2009 WL 320852, at *4 (M.D. Fla. Feb. 9, 2009) (unpublished); United States v. One Parcel of Property, No. 3:02-cv-665-F (WO), 2005 WL 2046250, at *3 (M.D. Ala. Aug. 23, 2005) (unpublished).

[3]      The page numbering in the top right-hand corner of Mr. White's original deposition transcript does not correspond with the page numbering assigned by the Electronic Case Filing system.  In this Report and Recommendation, the undersigned refers to the original page numbering in Mr. White's deposition transcript.

wanted to purchase two "eight balls" of cocaine. Id. at 26-27. An "eight ball" is one-eighth of an ounce of cocaine.

On January 2, 2008, Mr. White was involved in an automobile accident and sustained injuries. See id. at 34; Mr. White's Responses to Plaintiff's First Set of Interrogatories (Doc. No. 23-3; "Responses to First Interrogatories") at 16. Mr. White's medical bills stemming from the accident exceeded $46,000.[4] See Responses to First Interrogatories at 9-15. Mr. White received a settlement for his injuries in an amount totaling $85,000 from three insurance companies. See Verified Claim at 1 ¶ 3; Doc. No. 10-3 at 1-3; Doc. No. 10-4 at 1-3. Mr. White worked as a truck driver prior to his accident, but he did not resume driving trucks after the accident due to his injuries. White Dep. at 12-14. Mr. White received a disability check in the amount of $1,200 per month for a number of months following the accident until he was terminated by his employer in "either March or May of 2008." Id. at 14. Prior to his termination, on February 27, 2008, Mr. White purchased the 2004 Mercedes CLK 320 for $27,000 with funds from his car accident settlement. Id. at 76-77; Doc. No. 10-2 at 1. After he was terminated, Mr. White did not hold a legitimate job. White Dep. at 15. Mr. White's monthly expenses following his car accident on January 2, 2008 were more than $1,300, not including child support. Responses to First Interrogatories at 5.

According to Mr. White, at some point in 2008, Shorty contacted him to purchase cocaine.[5] See White Dep. at 25-28. On that occasion, Shorty requested either "the usual

---

[4]     Although not abundantly clear, the undersigned surmises Mr. White's medical bills were paid by an insurance company.

[5]     The exact dates of some of the events prior to and following Mr. White's car accident are unclear. It appears the first time Mr. White obtained drugs in 2008 was the above occasion when Shorty contacted him to purchase cocaine. White Dep. at 43. It is evident, however, from the transcript of Mr. White's deposition that Mr. White sold drugs prior to 2008. Id. at 21, 26-27; see id. at 31 (indicating

(continued...)

or deuce." Id. at 27.  Mr. White obtained the cocaine for Shorty from an individual known as "Fat Boy," who was present when Shorty arrived at Mr. White's residence to purchase the cocaine.[6]  Id. at 28.  A number of days after this drug transaction, Shorty again called Mr. White to purchase an "eight ball" of cocaine.  Id. at 44.  Mr. White obtained the cocaine from Fat Boy, and Mr. White sold the cocaine to Shorty at Mr. White's residence.  Id.

As a general practice, when Mr. White needed drugs from Fat Boy, he would arrange a meeting with Fat Boy at a club called "Cocktails."  Id. at 55, 65.  Mr. White would drive the 2004 Mercedes CLK 320, his only vehicle, see id. at 34,  to Cocktails to meet Fat Boy,[7] id. at 57, 68.  The two men would discuss drug business.[8]  Id. at 56.  The purpose of these meetings was to make arrangements for Mr. White to obtain drugs from Fat Boy at a later time.  See id. at 66.  After their meetings at Cocktails, Mr. White would leave, usually driving home, and await the delivery of the drugs he and Fat Boy had discussed at Cocktails.  Id.  Once Fat Boy supplied the drugs, Mr. White sold the drugs to Shorty and to at least two other individuals, see id. at 44-45.

Eventually, Mr. White's illegal drug activity "got out of hand," and he began selling drugs supplied to him by his cousin.  Id. at 23; see id. at 35, 41.  When he first started selling cocaine supplied by his cousin, Mr. White was buying "a couple of ounces" of cocaine at a

---

[5](...continued)
Mr. White obtained drugs on "a couple occasions" prior to the first transaction of 2008).

[6]     Mr. White's purchases from Fat Boy were consistently between two and four ounces of cocaine at a time.  White Dep. at 50-51.

[7]     Mr. White indicated he sometimes would already be at Cocktails when he called Fat Boy to meet.  White Dep. at 66.

[8]     Mr. White clarified that his trips to Cocktails were not always related to drugs.  White Dep. at 55-56, 68.

time. Id. at 36.  Mr. White eventually increased the amount of cocaine he purchased to nine ounces at a time.  Id. at 47.  He purchased this amount twice.  Id.  Mr. White further increased the amount of his cocaine purchases, and he bought at least two "kilos"[9] of cocaine on separate occasions.  Id. at 48, 50.  Mr. White paid $30,000-$33,000 in cash per "kilo" for the cocaine he obtained from his cousin.  Id. at 48.  Mr. White also purchased cocaine in an amount "somewhere between [nine] ounces and a kilo."  Id. at 49.  When Mr. White purchased less than a "kilo" of cocaine, he paid $1,000 per ounce.  Id. at 52.  Mr. White in turn sold the cocaine to others in exchange for cash.  Id. at 71.

Mr. White obtained cocaine from both his cousin and Fat Boy to maintain his supply of cocaine for distribution.  Id. at 31-32, 43.  Mr. White's cousin became his primary source of cocaine.  See id. at 41.  In fact, at times Mr. White even sold drugs to Fat Boy when Fat Boy "couldn't get his hands on [any cocaine,]" id. at 46, in addition to selling cocaine to "a couple" of Fat Boy's friends, id. at 49.

On February 27, 2009, Mr. White was arrested for selling approximately 2.8 grams of cocaine to Shorty for $350.  Id. at 101.  At the time, Shorty was working for law enforcement as a confidential source.  See id. at 17.  The money used by Shorty to make the purchase was furnished by the Drug Enforcement Administration ("DEA") from the DEA Official Authorized Funds ("DEA OAF").  Plaintiff's First Set of Request for Admissions to Claimant Leonard Leroy White (Doc. No. 23-2; "First RFA")[10] at 2 ¶ 1; White Dep. at 101.

---

[9]      A "kilo" is a kilogram of cocaine, and according to Mr. White, a "kilo" is equal to about thirty six ounces of cocaine.  See White Dep. at 48.

[10]     The page numbering at the bottom of the First RFA does not correspond with the page numbering assigned by the Electronic Case Filing system.  In this Report and Recommendation, the undersigned refers to the page numbering assigned by the Electronic Case Filing system to the First RFA because the First RFA is a composite exhibit consisting of two separate documents.

Mr. White was charged with the sale of cocaine and trafficking in cocaine in the Fourth Judicial Circuit in and for Clay County, Florida.  See White Dep. at 5, 8-9.  Mr. White entered a guilty plea to the two charges against him stemming from the drug transaction with the confidential source (Shorty).[11]  See id. at 9.

The Subject Property Plaintiff seeks to forfeit was seized during the events underlying Mr. White's arrest on February 27, 2009.  The illegal drug transaction that provided the basis for Mr. White's arrest occurred at his residence.  Id. at 17.  To set up the drug deal, Shorty called Mr. White and asked to come by Mr. White's residence to purchase cocaine.  Id. at 17-18.  After Shorty arrived at Mr. White's residence, the two men briefly talked.  Id. at 17.  Mr. White then went into his bedroom and retrieved "an eight ball" of cocaine that Shorty intended to purchase.  Id.  Mr. White gave Shorty a bag containing the drugs, and Shorty put the drugs in his pocket.  Id.  Shorty gave Mr. White "$350 exact" for the cocaine.  Id. at 19.

On the same day Mr. White sold the cocaine to Shorty, Mr. White was arrested while driving his 2004 Mercedes CLK 320 to "Fisherman's Dock" to get some food for his mother.  Id. at 62.  During a search of Mr. White's vehicle and a search of his person incident to his arrest, DEA found $2,111 on his person, $350 of which was from the DEA OAF used by Shorty to purchase the cocaine.  See id. at 98, 102.  Additionally, DEA recovered a firearm from Mr. White's vehicle.  Id. at 62.  "[A] K-9 unit gave a positive indication on the passenger side door of . . . [Mr. White's] vehicle,"  First RFA at 3 ¶ 6, 5 ¶ 6, but no illegal drugs were

---

[11]     Plaintiff states in the Motion that this plea was entered on October 22, 2009.  Motion at 2 n.1.

found inside the vehicle, <u>see</u> Declaration of DEA Special Agent Nathan Koen (Doc. No. 1, Ex. A; "Koen Decl.") at 10 ¶ 10.

Inside Mr. White's residence, a drug-detecting dog gave a positive indication of the presence of illegal drugs in the master bedroom and master bedroom closet. <u>Id.</u> There was a locked safe in the master bedroom closet. <u>Id.</u> at 11 ¶ 11. Mr. White advised DEA agents how to open the safe. <u>Id.</u>; First RFA at 3 ¶ 7, 5 ¶ 7. Inside the safe, agents found $8,047 and approximately 220 grams of cocaine. Koen Decl. at 11 ¶ 11; First RFA at 3 ¶ 7, 5 ¶ 7. Agents discovered about 80 grams of cocaine elsewhere in the master bedroom. Koen Decl. at 11 ¶ 11. Agents also found in Mr. White's residence "scales" and "sandwich bags" used to package cocaine. White Dep. at 69-70.

DEA Agent Koen advised Mr. White of his Miranda rights. Koen Decl. at 10 ¶ 9. When questioned about the source of cocaine that Mr. White sold to the confidential source (Shorty), Mr. White admitted Fat Boy was the source.[12] <u>Id.</u>

### IV.  Discussion

**A.       Applicability of the Innocent Owner Defense**

---

[12]       Regarding this admission, in an exchange between government counsel and Agent Koen at Mr. White's deposition, Agent Koen recounted the following in Mr. White's presence:

> We asked if you were willing to speak with the guy that you had previously had transactions with and you said, yes, I'll – I'm willing to do that. We said, who's that person. You said it's Fat Boy. I said, do you have his number. You said, it's in my telephone. I handed you your telephone. You went to the number, showed me the number. And I said, how did it go down. You explained that I would call Fat Boy, we would go up to Cocktails and meet, we would make arrangements there, but I would not receive the dope there, he would bring it by later that day or maybe the next day he would bring it by.

White Dep. at 105. Although Mr. White's deposition testimony regarding the procedures used to obtain cocaine from Fat Boy varied to a degree, <u>see id.</u> at 55-56, 65-68, Mr. White confirmed during the deposition that Agent Koen's above statement was accurate. <u>See id.</u> at 105.

The undersigned first addresses the relevancy of the innocent owner defense.  In the Motion, Plaintiff asserts that "no genuine issue of material fact exists as to whether [Mr. White] is an innocent owner."   Motion at 6 (capitalization omitted).   In support of this assertion, Plaintiff contends that "there is no genuine material fact disputing forfeiture of the defendant currency," id. at 7 (capitalization omitted), and "there is no genuine issue of material fact [as to whether] the defendant vehicle should be forfeited to the United States," id. at 11 (capitalization omitted).[13]  In arguing that a preponderance of the evidence supports forfeiture of the Subject Property, Plaintiff seemingly contends that the innocent owner defense is applicable in the instant case.  The Court disagrees.

Section 983(d) provides, in relevant part, as follows:

(d) Innocent owner defense.–

(1) An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute.   The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence.

(2)(A) With respect to a property interest in existence at the time the illegal conduct giving rise to forfeiture took place, the term "innocent owner" means an owner who--

(i) did not know of the conduct giving rise to forfeiture; or

(ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property.

18 U.S.C. § 983(d) (emphasis added).  Here, Mr. White was the perpetrator of the crimes that form the basis of this forfeiture action.   An innocent owner is generally someone who disavows involvement in the crime underlying the forfeiture and claims to have known nothing about the criminal activity, not someone who committed the crime or crimes giving

---

[13]      Plaintiff further alleges that Mr. White has failed to establish a legitimate claim to the Subject Property because he has "repeatedly changed answers" regarding the facts of the case and he "refused to answer certain discovery."  Motion at 13-14 (capitalization omitted).

rise to forfeiture.  Given that Mr. White committed the crimes forming the basis of this forfeiture action, he cannot raise the innocent owner defense.

In fact, Mr. White has not raised an innocent owner defense, yet Plaintiff attempts to rebut that defense.  <u>See generally</u> Verified Claim; Answer.  Mr. White only contends the following with regard to the Subject Property: (1) the funds are not subject to forfeiture because the subject currency was obtained from his car accident settlement, not from illegal drug transactions; (2) the subject vehicle was purchased with money from his car accident settlement (which Plaintiff does not dispute); and (3) the vehicle was not used in any manner related to illegal drug transactions.  Verified Claim at 1 ¶ 2; Answer at 1.

Plaintiff must establish by a preponderance of the evidence that the property in dispute is subject to forfeiture, not rebut a nonexistent innocent owner defense.  <u>See</u> 18 U.S.C. § 983(c).  Although Plaintiff has addressed whether there are material facts in dispute as to forfeiture of the Subject Property, the issue is discussed within the context of the innocent owner defense.  Because the evidence Plaintiff presents in support of its assertion that Mr. White is not an innocent owner is equally applicable in determining whether the property is subject to forfeiture, the evidence can be used to determine whether Plaintiff has met its burden of proving by a preponderance of the evidence that forfeiture is appropriate.  Moreover, the evidence can be considered in determining whether Mr. White has rebutted Plaintiff's evidence that the currency did not come from a legitimate source and that the vehicle has a substantial connection to illegal drug activity.

### B.  Analysis

Plaintiff is seeking forfeiture of U.S. currency in the amounts of $1,761 and $8,047. In addition, Plaintiff is seeking forfeiture of the 2004 Mercedes CLK 320.  As a threshold

matter, the undersigned addresses Mr. White's standing to contest the forfeiture action. Plaintiff does not challenge Mr. White's standing, although it disputes the legitimacy of Mr. White's claim. See generally Motion. Mr. White had possession of the subject currency and subject vehicle. The two amounts of currency recovered subsequent to Mr. White's arrest were found on Mr. White's person and inside a locked safe in his residence, respectively. See White Dep. at 72-74. Mr. White purchased the vehicle from a car dealership in Georgia. See id. at 38; Doc. No. 10-2 at 1. Thus, the undersigned is satisfied Mr. White has standing to contest this forfeiture action. See $114,031.00 in U.S. Currency, 284 F. App'x at 755.

### 1.    $1,761 and $8,047 in U.S. Currency

Plaintiff asserts that between Mr. White's car accident on January 2, 2008 and his arrest on February 27, 2009, Mr. White's expenses far exceeded his legitimate income. See Motion at 7-11. Therefore, according to Plaintiff, the money seized on February 27, 2009 had to have been derived from Mr. White's illegal drug activity. Id. at 11. Regarding Mr. White's assertions in the Verified Claim and Answer, Plaintiff argues Mr. White's claim that the $1,761 and the $8,047 were part of his car accident settlement is "unbelievable." Id. at 7.

As discussed above, Mr. White failed to provide a sufficient response to the Motion for the Court's consideration. Upon review of the file, however, the undersigned gleans that Mr. White opposes forfeiture of the $1,761 and the $8,047 because he allegedly obtained the money from his car accident settlement. See Verified Claim at 2 ¶ 5; Answer at 1. Mr. White claims the $1,761 found on his person, which was commingled with the $350 from the illegal drug transaction, was intended to be used to pay bills. White Dep. at 72. As to the

$8,047 recovered from his safe, Mr. White claims the money was from a legitimate source because he always kept the money obtained from illegal drug transactions in his "dresser drawers," Mr. White's Responses to Second Set of Interrogatories (Doc. No. 23-4; "Responses to Second Interrogatories")[14] at 12, as opposed to his legitimate money which he kept in his safe.[15]

> Section 881 provides that the following are subject to forfeiture:
>
> All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

21 U.S.C. § 881(a)(6).  When the Government is seeking forfeiture of money, "evidence of legitimate income that is insufficient to explain the large amount of property seized, unrebutted by any evidence pointing to any other source of legitimate income . . . , satisfies the burden imposed by the statute."  United States v. $174,206.00 in U.S. Currency, 320 F.3d 658, 662 (6th Cir. 2003) (finding such evidence sufficient under both the "probable cause" and "preponderance of the evidence" standards).

Plaintiff relies in part on United States v. $52,000.00 in U.S. Currency, 508 F. Supp. 2d 1036 (M.D. Ala. 2007) in support of forfeiture of the currency.  See Motion at 10-11.  In $52,000.00 in U.S. Currency, the currency was seized from an individual as he passed

---

[14]    The page numbering at the bottom of the Responses to Second Interrogatories does not correspond with the page numbering assigned by the Electronic Case Filing system.  In this Report and Recommendation, the undersigned refers to the page numbering at the bottom of the Responses to Second Interrogatories.

[15]    Despite Mr. White's claim that "[a]ny and all . . . cash obtained or connected to the drugs found at his residence was always kept separately [from his legitimate funds] and placed in his dresser drawers," Responses to Second Interrogatories at 12, nothing in the record indicates that DEA agents found any money in Mr. White's dresser drawers.

through airport security, and security officers discovered he was carrying $52,000 in cash separated into three envelopes.  $52,000.00 in U.S. Currency, 508 F. Supp. 2d at 1038. The individual claimed he was traveling for work.  Id.  The cash purportedly belonged to the individual's cousin, the claimant in the case.  Id.  The claimant averred that the cash was not related to drug activity.  Id.  The claimant stated $37,000 represented his life savings and $15,000 had been loaned to him by a third person.  Id. at 1041.  Supposedly, the individual stopped at the airport, the claimant, and the third person were starting a clothing retail business together.  Id. at 1038, 1042.  The Government offered evidence showing the claimant had a cash flow deficit for each of the five years preceding the year the funds were seized.  Id. at 1041-42.  Also, the Government produced evidence that the claimant and the two other people allegedly starting the clothing business each had a history of illegal drug activity.  Id. at 1042.  In granting the Government's motion for summary judgment, the court reasoned that in aggregate, the large amount of cash found on the individual stopped at the airport; "the lack of evidence of any apparent, legitimate, or verifiable income to support [the claimant]'s argument that the [subject currency] is a result of his earnings and savings"; and the history of illegal drug-related activity on the part of the claimant and the individual stopped at the airport was sufficient to establish that the currency was connected to illegal drug activity.  Id. at 1044.

The factors identified in $52,000.00 in U.S. Currency are present in the instant case. Each factor is addressed in turn.

### a.      Possession of Large Amounts of Cash

Cash in the amounts of $1761 and $8047 (totaling $9808) were found on Mr. White's person and inside his residence, respectively.  Although the amounts found in this case are

not as large as the amount discovered in $52,000.00 in U.S. Currency, $9808 is nevertheless a substantial amount of cash for an unemployed person to have on hand. Further, more compelling than in $52,000.00 in U.S. Currency are the circumstances surrounding the discovery of the cash here.

As to the $1,761, it is undisputed that Mr. White commingled this money with money he collected from a confidential source (Shorty) in exchange for cocaine on the day of his arrest. See White Dep. at 98, 101. The money had been furnished by DEA from the DEA OAF. See id. at 101. When Mr. White was searched subsequent to his arrest, DEA agents found $2,111 in his pocket. Id. at 98. Of the $2,111 found in Mr. White's pocket, $350 was identified as the money from the DEA OAF given to Mr. White by the confidential source (Shorty). Koen Dec. at 10 ¶ 8; see White Dep. at 98. Mr. White admitted that he received $350 from the confidential source (Shorty) in exchange for cocaine. White Dep. at 19.

It is further undisputed that the $8,047 seized by DEA agents subsequent to Mr. White's arrest was found in close proximity to illegal drugs located inside Mr. White's residence. Mr. White admits that he purchased at least two kilograms of cocaine, which he sold in smaller amounts, see id. at 48-51, 77-78, and that on a number of occasions he conducted illegal drug transactions from within his residence, id. at 56-57. Agents found the $8,047 next to a "shoebox" containing cocaine inside a locked safe in Mr. White's bedroom closet. Koen Decl. at 11 ¶ 11. Mr. White told agents how to unlock the safe. See id.; First RFA at 3 ¶ 7, 5 ¶ 7. Agents also found cocaine elsewhere in Mr. White's bedroom. Koen Decl. at 11 ¶ 11. Although Mr. White does not recall "how that shoebox got into [his] safe,"[16]

---

[16]     Mr. White testified as follows:

(continued...)

he admits that illegal drugs were in his residence.  White Dep. at 100-01.  In fact, when Mr. White testified regarding the drug transaction with the confidential source (Shorty), Mr. White stated he went into his bedroom to retrieve the drugs he sold to Shorty.  See id. at 17. Mr. White has not offered evidence that any other person had access to the safe in his closet prior to DEA agents opening the safe.  Mr. White concedes that in addition to the drugs and the $8,047 found in his safe and bedroom, DEA agents recovered from other locations in Mr. White's residence "a couple scales" and "sandwich bags" related to illegal drug transactions.  Id. at 69-70.

### b.    Sources of Income

Mr. White's only legitimate sources of income from January 2, 2008 until his arrest on February 27, 2009 consisted of his car accident settlement ($85,000), see Doc. No. 10-3 at 1-3; Doc. No. 10-4 at 1-3, and his disability income ($1,200 per month), see White Dep. at 14.  Mr. White only received disability income until he was terminated from his job, which was May 2008 at the latest (thus totaling no more than $6,000).  See id. at 13-14.  As a result, Mr. White's total legitimate income from January 2, 2008 until his arrest on February 27, 2009 did not exceed $91,000.

Regarding Mr. White's expenditures for the same period of time, Mr. White purchased the 2004 Mercedes CLK 320 ($27,000), see Doc. No. 10-2 at 1, and he had monthly

---

[16](...continued)
I had a shoebox and I was doing something, moving stuff around in my closet, I was pushing stuff around and somehow or another, I cannot tell you how that shoebox got into my safe like that there, but I knew when I left the house that I went into my safe – I knew when I left the house I went into my safe and I looked, because I was fixing to get something out of there, but I did not remove that shoebox.  I can't recall how that shoebox really got there.

White Dep. at 100.

expenses not including child support that exceeded $18,000 (at $1,300 per month for fourteen months), <u>see</u> Responses to First Interrogatories at 5.   Additionally, Mr. White purchased two "kilos" of cocaine ($60,000-$66,000), <u>see</u> White Dep. at 48, 50, and at least 37 ounces of cocaine at $1,000 per ounce ($37,000), <u>see</u> id. at 27, 31, 36, 44-45, 47, 48, 49, 50, thus equaling a minimum of $97,000 in illegal drug purchases.

Mr. White's only legitimate income from January 2, 2008 until February 27, 2009 was $91,000.  Mr. White's total expenditures for legitimate and illegal purchases during the same time period was at least $142,000.  Mr. White's expenditures exceeded his legitimate income by at least $51,000 for the relevant time period.  Although Mr. White asserts he always kept his drug money and legitimate money separate, <u>see</u> Responses to Second Interrogatories at 12, and that he used money received from the sale of cocaine to purchase more cocaine, <u>see</u> White Dep. at 77-78, Mr. White has not presented evidence (and the record does not contain sufficient evidence) to support his assertions.  The undersigned deduces that the $51,000 were derived from the sale of illegal drugs.

### c.    History of Illegal Drug Transactions

Mr. White has an undisputed history of illegal drug transactions.  Mr. White admitted he obtained cocaine for distribution from his cousin and Fat Boy.  <u>Id.</u> at 31-32, 43.  He engaged in a number of illegal drug transactions with Shorty beginning at some point prior to 2008 and continuing until Mr. White's arrest on February 27, 2009.  <u>Id.</u> at 17-19, 25-28, 44, 45.  Additionally, Mr. White admitted to selling cocaine to a number of other individuals besides Shorty, including Fat Boy (one of Mr. White's drug suppliers) and Fat Boy's friends. <u>Id.</u> at 46, 49.  Finally, Mr. White pleaded guilty to the two state of Florida drug offenses underlying this forfeiture action.  <u>Id.</u> at 5, 9.

### d.    Conclusion as to the Currency

Similar to the claimant in $52,000.00 in U.S. Currency, Mr. White was found with large amounts of cash on his person and in his residence; there is a lack of evidence supporting that the cash came from a legitimate source of income; and he has an undisputed history of illegal drug transactions.  C.f. $52,000.00 in U.S. Currency, 508 F. Supp. 2d at 1044.  The currency has an even stronger connection to illegal drugs here given that the $8,047 was found next to cocaine inside a locked safe in Mr. White's bedroom closet, and the $1,761 was commingled with proceeds from the illegal drug transaction resulting in Mr. White's arrest.  Accordingly, the undersigned concludes that the $1,761 and the $8,047 were proceeds obtained from Mr. White's illegal drug transactions.[17]

There is no genuine issue of material fact with regard to the $1,761 and the $8,047. Plaintiff has established by a preponderance of the evidence that the $1,761 and the $8,047 in U.S. currency are subject to forfeiture.  Mr. White has not rebutted Plaintiff's evidence.

### 2.    2004 Mercedes CLK 320

Plaintiff argues the 2004 Mercedes CLK 320 was used in the commission or violation of narcotics laws.  See Motion at 11.  Plaintiff contends that Mr. White's "statement that the . . . [2004 Mercedes CLK 320] was not facilitating property is contradicted by other evidence and statements."  Id.

---

[17]    Assuming arguendo that the $1,761 were from a legitimate source, "under [S]ection 881(a)(6), legitimate funds are forfeitable when knowingly commingled with forfeitable funds."  United States v. One Single Family Residence, 933 F.2d 976, 982 (11th Cir. 1991); see $52,000.00 in U.S. Currency, 508 F. Supp. 2d at 1044 (stating that "[o]nce legitimate funds are commingled with those subject to forfeiture, all of the funds become subject to forfeiture").  Thus, even if the $1,761 had been obtained from a legitimate source as Mr. White claims, because the currency was commingled with drug proceeds, the allegedly legitimate funds are subject to forfeiture.

Reviewing the Verified Claim, Answer, and the transcript from Mr. White's deposition, the undersigned surmises Mr. White opposes forfeiture of the 2004 Mercedes CLK 320 for two reasons: (1) the vehicle was purchased with legitimate funds; and (2) he never used the vehicle in any manner related to illegal drug transactions. See Verified Claim at 2 ¶ 4; Answer at 1; White Dep. at 59-60.  Plaintiff does not dispute that Mr. White purchased the vehicle with legitimate funds but asserts that the vehicle was used to facilitate illegal drug transactions.

Section 881 provides for forfeiture of the following:  "[a]ll conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph (1), (2), or (9)."  21 U.S.C. § 881(a)(4).  As stated above, "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense."  18 U.S.C. § 983(c)(3).  The Government does not have to produce evidence connecting the property to be seized "to a particular narcotics transaction"; rather, it need only show the property was "'related to some illegal drug transaction.'"  $183,791.00 in U.S. Currency, 391 F. App'x at 794 (quoting $242,484.00 in U.S. Currency, 389 F.3d at 1160).

Here, Plaintiff has offered sufficient evidence that a substantial connection exists between the 2004 Mercedes CLK 320 and Mr. White's illegal drug transactions. See 18 U.S.C. § 983(c)(3).  Plaintiff's uncontroverted evidence consists, in part, of the following: (1) Mr. White's only vehicle was the 2004 Mercedes CLK 320, see White Dep. at 34; (2) Mr.

White was driving the vehicle on February 27, 2009, the same day as the drug transaction with the confidential source (Shorty), see id. at 62; (3) Mr. White was carrying $2,111 on his person while driving the vehicle, $350 of which he received from the drug transaction with the confidential source (Shorty), Koen Decl. at 10 ¶ 8; and (4) a drug-detecting dog gave a positive indication for drugs on the passenger side of the vehicle, id. at 10 ¶ 10.  See $291,828.00 in U.S. Currency, 536 F.3d at 1237 (stating that the Government may rely on circumstantial evidence to establish a substantial connection between the subject property and criminal activity).

The substantial connection is further bolstered by Mr. White's admissions to DEA agents following his arrest and his testimony at his deposition regarding the procedure he used to obtain cocaine from Fat Boy.  Mr. White told DEA agents that when he needed drugs, he would call Fat Boy and meet with him at Cocktails.  See Koen Decl. at 10 ¶ 9. There, Mr. White confirmed, the two men would discuss drug business.  White Dep. at 56. When the two men would leave Cocktails, Mr. White would drive back to his residence, and Fat Boy would leave to obtain drugs for Mr. White.  Id. at 66.  The drugs would later be delivered to Mr. White.  Id. at 66-67.  Mr. White drove the 2004 Mercedes CLK 320 to Cocktails for the meetings to arrange the drug transactions.  Id. at 68.  Mr. White conveyed this story to Plaintiff at his deposition, see id. at 65-68, and he confirmed later at the deposition the accuracy of Agent Koen's characterization of Mr. White's admission following his arrest regarding the procedure used to obtain drugs from Fatboy, see id. at 105.

There is no genuine issue of material fact with regard to the 2004 Mercedes CLK 320. Plaintiff has established by a preponderance of the evidence that a substantial connection exists between the 2004 Mercedes CLK 320 and Mr. White's illegal drug transactions;

consequently, the 2004 Mercedes CLK 320 is subject to forfeiture.  See 18 U.S.C. § 983(c)(3).  Although the vehicle may have been purchased with legitimate funds, Mr. White has not rebutted Plaintiff's evidence that there is a substantial connection between the 2004 Mercedes CLK 320 and illegal drug activity.

## V.  Conclusion

The undersigned finds that Plaintiff has shown there is no genuine issue of material fact in dispute as to the Subject Property.  Plaintiff has met its burden of establishing by a preponderance of the evidence that the $1,761 in U.S. currency, the $8,047 in U.S. Currency, and the 2004 Mercedes CLK 320 are subject to forfeiture.  Mr. White has not rebutted Plaintiff's evidence.  Accordingly, the undersigned concludes that Plaintiff is entitled to summary judgment.  See Fed. R. Civ. P. 56(a).

In light of the foregoing, it is

**RECOMMENDED:**

1.     That Plaintiff's Motion for Summary Judgment (Doc. No. 23) be **GRANTED.**

2.     That the $1,761 in U.S. currency; the $8,047 in U.S. currency; and the 2004 Mercedes CLK 320, VIN WDBTJ65JX4F094579 be forfeited to the United States of America under the provisions of 21 U.S.C. § 881 and 18 U.S.C. § 981 for disposition according to law.

3.     That the Clerk of the Court be directed to enter a Judgment in favor of Plaintiff and to close the file.

**RESPECTFULLY RECOMMENDED** at Jacksonville, Florida on May 27, 2011.

James R. Klindt
**JAMES R. KLINDT**
United States Magistrate Judge

-23-

wlg
copies:

The Honorable Marcia Morales Howard
United States District Judge

counsel of record
*pro se* party